

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————X

PEDRO SANTANA,

        **Plaintiff,**

    - against -

CORRECT CARE SOLUTIONS, LLC,
NEW YORK CORRECT CARE
SOLUTIONS MEDICAL SERVICES, P.C.,
WANDA SMITHSON, DR. RAUL ULLOA,
JUNE YOZZO, LINDA BEYER,
WESTCHESTER COUNTY, JEAN
WATSON,

        **Defendants.**

—————————————————————X

## OPINION AND ORDER

### 13 Civ. 1549 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

        Pedro Santana, presently incarcerated and proceeding pro se, brings

this action pursuant to section 1983 of Title 42 of the United States Code. Santana

sues Westchester County ("the County"), Correct Care Solutions, LLC ("CCS"),

New York Correct Care Medical Solutions, P.C. ("NYCCS"), Linda Beyer, Wanda

Smithson, Dr. Raul Ulloa, Jean Watson, and June Yozzo alleging that these

defendants deprived Santana of medical treatment in violation of the Eighth

Amendment. Santana seeks injunctive relief, a declaration that defendants violated

-1-

his constitutional rights, and punitive damages in the amount of $9,999,000 against each defendant.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Santana was not deprived of any constitutional right and that defendants were not deliberately indifferent to Santana's serious medical needs.  For the reasons stated below, defendants' motion for summary judgment is GRANTED.

## II.    BACKGROUND[1]

CCS is a limited liability company that provides medical care to inmates at Westchester County Jail, and NYCCS is its wholly owned subsidiary.[2] Dr. Ulloa, Nurse Beyer, and Nurse Watson were employees of CCS working at Westchester County Jail at all relevant times.[3]  Smithson is the Deputy

---

[1]    The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks*, 548 U.S. 521, 529–30 (2006).

[2]    *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 1.

[3]    *See id.* at 2.

Commissioner of Corrections for the County, and Yozzo is the County's former Medical Liaison for the Westchester County Jail.[4]

On October 10, 2012, Santana was arrested in Westchester County and held for twenty-four hours at the police precinct.[5] He was then transferred to Westchester County Jail where Nurse Watson performed his medical intake examination.[6] During this examination, Santana informed Watson that he has multiple medical conditions including diabetes, hypertension, high cholesterol, and sleep apnea.[7] Santana explained that he had been prescribed a continuous positive airway pressure ("CPAP") machine to treat his sleep apnea.[8] Watson made a note in the record that Santana has "unspecified sleep apnea," but told Santana that she could not issue a CPAP machine "without a prescription."[9] Santana submitted a

---

[4] *See id.*

[5] *See* Deposition of Santana ("Santana Dep."), Ex. A to Declaration of John M. Murtaugh ("Murtaugh Decl."), counsel for defendants, at 14:2–16:6.

[6] *Id.* at 18:2–16.

[7] *See id.* at 18:6–19:4.

[8] *See* Santana's Rule 56.1 Statement of Material Facts in Opposition to Summary Judgment ("Santana 56.1") ¶ 3. Defendants contend that Santana denied being treated for any illness or health problem other than flat feet. *See* Defendants' Rule 56.1 Statement of Material Facts in Support of Summary Judgment ("Def. 56.1") ¶ 2.

[9] Medical Records of Santana ("Medical Records"), Ex. B to Murtaugh Decl., at D00035; Santana Dep. at 19:10–13.

health service request for a CPAP machine the next day.[10]  On October 12, a different nurse took Santana's vitals and observed "no acute distress," but did not respond to his CPAP request or make any notes related to sleep apnea.[11]  Santana had another medical examination on October 21.[12]  The record from this examination, electronically signed by Nurse Watson and Dr. Ulloa, notes that Santana's physical and mental status was normal, and he did not report any pain.[13]  The notes state that Santana intended to submit another health service request for a "sleep apnea machine and evaluation."[14]  Santana submitted no further health service requests for his sleep apnea until November 9.[15]

On November 7, Nurse Beyer asked Santana to sign a release authorizing Westchester County Jail medical personnel to obtain medical records related to his sleep apnea.[16]  The next day, a CCS employee spoke to the office manager at Santana's primary health care provider and was told that the office had

---

[10]    See id. at 21:2–22; Medical Records at D00147.

[11]    Medical Records at D00134.

[12]    Id. at D00026–32.

[13]    Id.

[14]    Id. at D00032.

[15]    See Def. 56.1 ¶ 5; Santana 56.1 ¶ 7.

[16]    See Def. 56.1 ¶ 6; Medical Records at D00091.

no record that Santana was being treated for sleep apnea.[17]  The employee then called multiple health care providers in an attempt to learn where Santana had been treated.[18]  She reached a sleep center whose staff could not access its records, but was told to call back the following week.[19]  The medical staff made further efforts to obtain records related to Santana's sleep apnea treatment over the next three weeks.[20]

In the meantime, on November 15, Santana submitted a grievance complaining that he had yet to be issued a CPAP machine.[21]  On November 20, the grievance coordinator denied Santana's grievance after receiving an email from Director of Nursing Michael Kelly finding that there was no record of Santana's sleep apnea at any of the clinics contacted by the medical staff.[22]  However, in a letter to Smithson, Kelly noted that Santana had submitted a request for care on October 12 and that there was "no documentation to support that the [nurse

---

[17]     See Medical Records at D00133.

[18]     See id.

[19]     See id.

[20]     See id.; Def. 56.1 ¶ 8.

[21]     See J-255-12 New York State Commission of Correction Grievance Forms ("J-255-12 Grievance Forms"), Ex. C to Declaration of Santana ("Santana Decl."), at 1.

[22]     See id. at 3.

practitioner] addressed [Santana's] concern about sleep apnea or a CPAP unit."[23]

Santana appealed this denial.[24]  On November 28, Dr. Ulloa finally verified

Santana's prescription and recorded in his progress notes that Santana would be

called and started on a CPAP machine that day.[25]  However, Santana did not have

continuous access to a CPAP machine adjusted to his prescribed setting until

approximately five days later, in part because one of the nurses was not authorized

to adjust the CPAP machine.[26]  On December 3, Smithson, who had reviewed

Santana's grievance appeal, sent a memorandum to Santana stating that the

medical staff had had difficulty verifying that Santana had been prescribed a CPAP

machine, but that his complaint had been substantiated and his remedy granted.[27]

Santana testified that he had access to a CPAP machine on a daily basis and made

---

[23]     11/20/12 Letter from Kelly to Smithson, Ex. D to Santana Decl., at 1.

[24]     *See* J-255-12 Grievance Forms at 3.

[25]     *See* Def. 56.1 ¶ 9; Santana 56.1 ¶ 11.

[26]     *See* Santana 56.1 ¶ 5.  It is not clear from this record precisely when
Santana had access to an adequate CPAP machine.  On December 3, Santana
complained that his CPAP machine was "being taken away from him before he
want[ed] it taken from him."  Medical Records at D00127.  Records indicate that
Santana's CPAP machine was initially kept at "the bubble" where it was not
immediately accessible to him.  *Id.* at D00127–29, D00143–44.  Notes in his
medical file indicate that Santana was in "no acute distress" when he was seen by
medical staff on December 3.  *Id.*

[27]     *See* J-255-12 Grievance Forms at 5.

no complaints from December 3 through December 11 when he was transferred out of the Westchester County Jail.[28]  Santana was in the custody of the New York City Department of Corrections between December 11, 2012 and January 29, 2013, when he was returned to the Westchester County Jail.[29]

Santana received a CPAP machine as soon as he was returned to the Westchester County Jail.[30]  This machine was faulty, but he was issued a replacement that same day.[31]  On January 31, Santana submitted a health service request because his CPAP machine was on the wrong setting and was giving him "too much pressure."[32]  This problem was not addressed by medical staff for three days.[33]  Santana testified that he was "continuously complaining" during this time because his chest and stomach were hurting.[34]  On February 3, Dr. Ulloa ordered that Santana was to be kept in the infirmary until a new CPAP machine could be

---

[28]     *See* Def. 56.1 ¶¶ 11–12; Santana Dep. at 27:2–25.

[29]     *See* Def. 56.1 ¶¶ 11–12.

[30]     *See* Medical Records at D00125; Santana Dep. at 30:10–14.

[31]     *See* Santana Dep. at 30:10–25.

[32]     *Id.* at 31:3–8; Medical Records at D00142.

[33]     *See* Def. 56.1 ¶ 15; Medical Records at D000124.

[34]     Santana Dep. at 32:4–15.

obtained.[35]  Medical staff procured a new CPAP machine, but the machine needed

service, so Santana was held overnight in the infirmary for observation.[36]  The

notes of the nurse on duty that evening report, "[Santana] is ambulatory and in no

acute respiratory distress.  He denies c/o or discomfort [of] any nature."[37]  Santana

testified that "everything was fine" with his CPAP machine between February 3

and some time in March, when he had an issue that was "immediately" addressed.[38]

    Santana submitted a grievance on February 10, claiming that the

medical personnel at the Westchester County Jail were not qualified to treat his

sleep apnea and that the CPAP machines were faulty.[39]  This grievance was denied

on appeal through the final level of review, the Citizens' Policy and Complaint

Review Board.[40]  Nonetheless, Santana maintains that medical care at the

Westchester County Jail is inadequate because there is no sleep specialist on staff,

multiple members of the medical staff were not trained to adjust his CPAP

---

[35]     *See* Def. 56.1 ¶ 15; Medical Records at D00124.

[36]     *See* Medical Records at D00122.

[37]     *Id.*

[38]     Santana Dep. at 34:6–12.

[39]     *See* J-22-13 New York State Commission of Correction Grievance
Forms ("J-22-13 Grievance Forms"), Ex. E to Santana Decl., at 1.

[40]     *See id.* at 2–8.

machine to the proper setting, and he has been given a CPAP machine on the wrong setting and has had to adjust the settings himself.[41]  In further support of this contention, Santana has cited to the case of another Westchester County inmate whose sleep apnea treatment was similarly delayed.[42]  He also cites to a 2009 report stating that grievance forms were unavailable to prisoners at Westchester County Jail, and detailing deficiencies in infection control and dental care.[43]

Prior to Santana's incarceration, Dr. Ahmed Fadil diagnosed him with "moderate" sleep apnea and prescribed a CPAP machine.[44]  In a "Letter of Medical Necessity" dated August 20, 2013, Fadil characterized Santana's condition as "Severe Obstructive Sleep Apnea," for which a CPAP machine is "medically necessary," and directed that Santana should continue using the CPAP machine

---

[41]    *See* Staffing Plan, Ex. H to Santana Decl. (prison does not have a sleep specialist on medical staff); Santana Dep. at 33:10–11 (testifying that Ulloa, Yozzo and a third member of the medical staff "couldn't even program the [CPAP] machine"); *Id.* at 36:9–17 (testifying that Ulloa asked Santana set up his own CPAP machine);  Santana 56.1 ¶ 5 (alleging that a nurse practitioner not named as a defendant told Santana she was not authorized to touch the CPAP machine).

[42]    *Ross v. Westchester Cnty.*, No. 10 Civ. 3937, 2013 WL 5178354, at *6 (S.D.N.Y. Sept. 16, 2013), *appeal dismissed* (Feb. 20, 2014) (inmate raised a material question of fact as to the County's deliberate indifference to treating his sleep apnea over a three month period).

[43]    *See* CRIPA Investigation of the Westchester County Jail, Ex. G to Santana Decl., at 23.

[44]    Insomnia and Sleep Medicine Records, Ex. A to Santana Decl., at 14.

indefinitely.[45]   According to Dr. Fadil, "[f]ailure to treat sleep apnea will result in a wide range of medical complications to name a few, heart attacks, strokes, hypertension, and chronic fatigue[.]"[46]

Defendants' medical expert, Dr. Fred Lin, who is the Director of the Mount Sinai Sleep Surgery Center, reviewed Santana's medical records and deposition testimony.[47]   In Dr. Lin's medical opinion, Santana suffers from "moderate" sleep apnea.[48]   Dr. Lin opines that there are no physiological complications of untreated moderate sleep apnea besides loss of sleep and states with "a reasonable degree of medical certainty" that Santana's "moderate sleep apnea was not the cause of" Santana's other medical conditions.[49]   Santana claims

---

[45]     8/20/13 Letter of Medical Necessity ("Fadil Letter"), Ex. A to Santana Decl., at 1A.

[46]     *Id.*

[47]     *See* Def. Mem. at 12.

[48]     Report of Dr. Fred Lin ("Lin Report"), Ex. E to Murtaugh Decl., at 1.

[49]     *Id.* at 2.  Santana objects to the use of this expert report because it was submitted after the date initially set by Magistrate Judge Peck, September 30, 2013.  *See* Santana 56.1 ¶ 21; Transcript of 9/4/13 Conference before Magistrate Judge Peck at 8:13–25.  However, both the discovery deadlines and the deadline to file motions for summary judgment were extended after that conference.  *See* 11/4/13 Letter from Murtaugh to Magistrate Judge Peck.  Santana does not allege that he did not receive defendants' expert report, or that disclosure was not made in accordance with the new deadlines, merely that defendants did not file an expert report before September 30.

that the failure to treat his sleep apnea has caused him physical pain, loss of sleep, and emotional anguish stemming from his worries that he would die without access to a CPAP machine.[50]

## III.   APPLICABLE LAW

### A.   Summary Judgment

"Summary judgment is appropriate 'only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[51]  "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[52]  "'A fact is material if it might affect the outcome of the suit under the governing law.'"[53]

---

[50]    *See* Complaint ¶¶ 21, 25; Santana Dep. at 41:13–42:20.

[51]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 96 (2d Cir. 2009)) (other quotations omitted).

[52]    *Benn v. Kissane,* 510 Fed. App'x 34, 36 (2d Cir. 2013) *cert. denied,* 134 S. Ct. 78 (2013) (quoting *General Star Nat'l Ins. Co. v. Universal Fabricators, Inc.,* 585 F.3d 662, 669 (2d Cir. 2009)) (other quotations omitted).

[53]    *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012) (quoting *Bessemer Trust Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010)).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[54]  To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[55] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[56]

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."[57]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[58]

---

[54]     *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[55]     *Valenti v. Penn Mut. Life Ins. Co.*, 511 Fed. App'x 57, 58  (2d Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586  (1986)).

[56]     *Northeast Research, LLC v. One Shipwrecked Vessel,* 729 F.3d 197, 214 (2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

[57]     *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

[58]     *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

-12-

Although "[p]ro se parties are entitled to 'extra consideration' on summary judgment motions," they are not relieved from "the usual requirements of summary judgment."[59] "Thus, a pro se plaintiff's 'failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion [for summary judgment] ineffectual.'"[60]

## B.   Section 1983

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'"[61]  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for

---

[59]     *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004) *aff'd sub nom. Maalouf v. Citigroup Global Mkts., Inc.*, 156 Fed. App'x 367 (2d Cir. 2005) ("'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment.'" (quoting *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999))).

[60]     *Anderson v. City of New York Dep't of Corr.*, No. 11 Civ. 4069, 2013 WL 702918, at *2 (S.D.N.Y. Feb. 26, 2013) (quoting *Kadosh v. TRW*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994)).

[61]     *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

enforcing a right or benefit established elsewhere."[62]  Imposition of liability under

section 1983 requires a defendant's direct involvement in the alleged constitutional

violation.[63]  "Because vicarious liability is inapplicable to . . . [section] 1983 suits,

a plaintiff must [prove] that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."[64]  Thus, a

supervisory official cannot be held liable solely on account of the acts or omissions

of her subordinates.[65]

       In *Monell v. New York City Department of Social Services*, the

Supreme Court held that to establish a claim against a municipality under section

1983, a plaintiff must show harm resulting from an identified municipal "policy or

---

[62]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[63]     *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991))).

[64]     *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) (citations omitted) (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

[65]     *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

custom."[66]  A municipality may not be found liable simply because one of its

employees or agents is guilty of some wrongdoing.[67]  In the absence of an

established written municipal policy, a plaintiff must prove that a practice "'was so

persistent or widespread as to constitute a custom or usage with the force of

law,'"[68] or that a practice or custom of subordinate employees was "'so manifest as

to imply the constructive acquiescence of senior policy-making officials.'"[69] Thus,

municipal liability under section 1983 may be established through evidence that

"the municipality's practice, as opposed to its formal policy, is to engage in the

constitutional violation at issue."[70]  However, a policy or custom is not established

by a single instance of unconstitutional conduct by an employee.[71]  "Although

---

[66]     436 U.S. 658, 694 (1978).

[67]     *See Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

[68]     *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting *Patterson v. County of Oneida*, *N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)) (other quotation marks omitted).

[69]     *Id.* (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).

[70]     *Green*, 465 F.3d at 80 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–26 (2d Cir. 2004)).

[71]     *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in

-15-

*Monell* dealt with municipal employers, its rationale has been extended to private businesses."[72]

## C.     Deliberate Indifference to a Serious Medical Need

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."[73]  To establish a claim for deliberate indifference, a plaintiff must show that the deprivation of medical care was "sufficiently serious" and that the charged official acted with a "sufficiently culpable state of mind."[74]  Thus, "[t]o show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components."[75]

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition,"[76] and "the serious medical need

---

*Monell*.").

[72]     *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 409 (2d Cir. 1990). *Accord Whalen v. Allers*, 302 F. Supp. 2d 194, 203 (S.D.N.Y. 2003).

[73]     *Estelle v. Gamble*, 429 U.S. 97, 101 (1976).

[74]     *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

[75]     *Taylor v. Goorde* [sic], No. 13-1196-pr., 2013 WL 6670716, at *1 (2d Cir. Dec. 19, 2013) (citing *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009)).

[76]     *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

-16-

inquiry must be tailored to the specific circumstances of each case."[77]   The Second

Circuit has set forth factors to guide this analysis, including:  "(1) whether a

reasonable doctor or patient would perceive the medical need in question as

'important and worthy of comment or treatment'; (2) whether the medical

condition significantly affects daily activities; and (3) the existence of chronic and

substantial pain."[78]   A "serious" medical condition is one that may "produce death,

degeneration or extreme pain."[79]   "In cases where the inadequacy is in the medical

treatment given, the seriousness inquiry is narrower."[80]   When considering an

alleged temporary delay or interruption in the provision of medical care, "the

seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment

rather than the prisoner's underlying medical condition alone.'"[81]

          In addition to establishing an objectively serious medical need, a

plaintiff bringing Eighth Amendment deliberate indifference claims must prove

---

[77]     *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).

[78]      *Brock*, 315 F.3d at 162 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).  *Accord Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998).

[79]     *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005).

[80]     *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

[81]     *Id.* (quoting *Smith*, 316 F.3d at 185).

that the defendants acted with a sufficiently culpable state of mind.[82]  "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.'"[83]  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[84] "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.'"[85]  Thus, deliberate indifference is more substantial than mere disagreement over a course of treatment, negligence or even medical malpractice.[86]

## IV.   DISCUSSION

### A.   Seriousness

Santana alleges that he was deprived of sleep apnea treatment in violation of his constitutional rights.  It is undisputed that Santana was not given a

---

[82]    *See Phelps v. Kapnolas*, 308 F.3d 180, 185–86 (2d Cir. 2002).

[83]    *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[84]    *Farmer*, 511 U.S. at 842.

[85]    *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

[86]    *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance*, 143 F.3d at 703; *Stevens v. Goord*, 535 F. Supp. 2d 373, 384 (S.D.N.Y. 2008).

CPAP machine for the first month and a half of his incarceration at the Westchester County Jail and that he has had intermittent problems with the functioning of several different CPAP machines.  However, the record does not establish that Santana's sleep apnea was sufficiently serious such that these lapses in care amounted to an Eighth Amendment violation.

Both Dr. Lin and Dr. Fadil opine that Santana has "moderate" sleep apnea.[87]  Santana's only evidence that his sleep apnea constitutes a serious medical condition is an unsworn letter in which Fadil contradicts his medical notes by stating that Santana has "severe" sleep apnea.[88]  In his letter, Fadil states that Santana's CPAP machine treatment is "medically necessary," and goes on to list the complications of untreated sleep apnea:  "heart attacks, strokes, hypertension, and chronic fatigue."[89]  But this opinion is not offered as to Santana's condition.  It is a statement solely about the potential complications of sleep apnea in general.[90]

But even if Santana had produced sufficient evidence that his sleep apnea is sufficiently grave to be constitutionally cognizable, because this condition

---

[87]     Insomnia and Sleep Medicine Records at 14; Lin Report at 1.

[88]     Fadil Letter at 1A.

[89]     *Id.*

[90]     I note that Fadil is a treating physician, not a Rule 26 expert.  *See* Fed. R. Civ. P. 26(a)(2).

was eventually treated, the focus of the inquiry here is the severity of the delay and interruption in his care rather than the seriousness of his medical condition.[91] There is no indication that Santana's health declined during the time he was without a CPAP machine, or that the temporary deprivation significantly affected his daily activities or caused him chronic and substantial pain.[92]  Prison medical records show that Santana did not mention that he was suffering adverse effects from the lack of a CPAP machine during his October 21 exam or when he was held for observation on February 3.  There is no evidence that Santana was ever in acute distress or experienced excessive pain.  Therefore, Santana has not established that the delay and intermittent interruption in the provision of a CPAP machine were sufficiently serious to constitute an Eighth Amendment violation.

### B.    Subjective Intent

#### 1.    Watson

When viewed in the light most favorable to Santana, the facts bearing on Watson's liability do not give rise to a claim for deliberate indifference to a serious medical need.  The parties dispute whether Santana informed Watson during his intake exam that he had a prescription for a CPAP machine.  Further, it

---

[91]    *See Salahuddin*, 467 F.3d at 280.

[92]    *See Brock*, 315 F.3d at 162.

is unclear whether Kelly's letter addressing Santana's grievance refers to Watson or to the nurse practitioner who failed to follow up on the CPAP request during Santana's October 12 medical exam.  At most, these facts show that Watson knew Santana had a prescription for a CPAP machine and failed to follow up on his CPAP request in a timely manner.  There is no indication that she deliberately denied access to a CPAP machine, or that she knew that the failure to provide a CPAP machine posed an excessive risk to Santana's health or safety.  Summary judgment for Watson is GRANTED.

### 2.    Ulloa

Santana claims that Dr. Ulloa denied Santana CPAP treatment and was negligent in the supervision and training of subordinates.  As evidenced by his electronic signature on Santana's medical records, Ulloa learned on October 21 that Santana had sleep apnea and was requesting a CPAP machine.   But given that Santana did not present objective complications or notify staff that he was in pain during this exam, there is no indication that Ulloa knew or should have known that Santana's condition posed a serious risk of "death, degeneration, or extreme pain."[93]  Further, because vicarious liability does not apply in section 1983 cases, Santana's claims against Ulloa cannot be based solely on the actions of his

---

[93]    *Johnson*, 412 F.3d at 403.

subordinates.[94]  Indeed, the only evidence regarding Ulloa's supervisory actions

show that he ordered medical personnel to issue Santana a CPAP machine after

speaking to Dr. Fadil.  There is no evidence that Ulloa violated Santana's

constitutional rights through his own acts or omissions or that he was grossly

negligent as a supervisor.  Summary judgment for Ulloa is GRANTED.

### 3.   Beyer

Santana has not produced evidence that Beyer was personally

involved in the alleged deprivation of medical care.  He states that Beyer provided

him with a form to authorize the release of his medical records, and after Santana

signed this form, the medical staff endeavored to find his CPAP prescription.

Thus, the only evidence concerning Beyer's actions shows that she affirmatively

aided Santana's treatment.  Summary judgment for Beyer is GRANTED.

### 4.   Yozzo

Santana claims that Yozzo refused to authorize his CPAP machine,

failed to provide needed medical attention, and interfered with the orders of a

licensed polysomnographic physician.[95]  Because Santana has not cited any

---

[94]     *See Iqbal*, 556 U.S. at 676–77.

[95]     *See* Complaint ¶ 29.

evidence of these claims, or even stated specific factual allegations against Yozzo,

summary judgment for Yozzo is GRANTED.

### 5.   Smithson

Santana claims that Smithson was negligent in her supervision of

subordinates, that she "refused to act on information" of unconstitutional medical

practices in 2009, and that she failed to remedy the medical grievance procedure.[96]

But Santana has failed to adduce any facts that would support a jury finding that

Smithson was deliberately indifferent to his constitutional rights or that she was

grossly negligent in supervising employees.  The record shows that Smithson

reviewed and responded to Santana's November 15 grievance about his care,

ensuring that his concerns had been investigated and addressed.[97]  Further, to the

extent that Smithson is responsible for remedying medical grievance policy,

Santana has neither pled nor substantiated that the medical grievance procedure at

the Westchester County Jail is currently ineffective.  Santana's only evidence with

regard to this claim is the 2009 report finding that grievance forms were

unavailable to prisoners at the Westchester County Jail.[98]  Santana has submitted

---

[96]      *Id.* ¶ 27.

[97]      See J-255-12 Grievance Forms at 5; 11/20/12 Letter from Kelly to
Smithson at 1.

[98]      *See* CRIPA Investigation of the Westchester County Jail at 23.

multiple grievances, and has not alleged any difficulty in filing these grievances. Summary judgment for Smithson is GRANTED.[99]

### C . *Monell* Claims

Because Santana has not shown that he was deprived of a constitutional right, there is no basis for *Monell* liability.[100]  Summary judgment for CCS, NYCCS and the County is GRANTED.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to close this motion (Docket No. 51) and this case.

---

[99]      Santana's submissions have been construed liberally and interpreted to raise the strongest arguments they suggest.  *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).  It is unclear whether Santana's claims that Ulloa, Yozzo, and Smithson were negligent are intended as a theory of liability under section 1983, or whether he seeks to bring state law claims against these parties.  I do not reach the issue of Ulloa's alleged negligence, but all pendent state law claims against Yozzo and Smithson are dismissed without prejudice.  *See* 28 U.S.C. § 1367.

[100]      *See Bobolakis v. DiPietrantonio*, 523 Fed. App'x 85, 87 (2d Cir. 2013) (no basis for imposing municipal liability where plaintiff had not suffered a violation of his constitutional rights).

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       May 6, 2014

**- Appearances -**

**Plaintiff (Pro Se):**

Pedro Santana
# 13R2869
Midstate Correctional Facility
P.O. Box 2500
Marcy, New York 13403

**For Defendants:**

John Murtaugh, Esq.
Gaines, Novick, Ponzini, Cossu & Venditti LLP
11 Martine Avenue
White Plains, New York 10606
(914) 288-9595